

48 Wall Street, Suite 1100
New York, NY 10005

Tel: 212-729-0952
www.HCLLPLaw.com

**Phil Hamilton**
Managing Partner
hamilton@HCLLPLaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA

       -against-

ALI DOBY

       Defendant.

---------------------------------------------------X

**Docket No.: 22-CR-142-VSB**

**Sentencing Memorandum**

    Ali Doby is a young man raised in a loving family, within a difficult section of the Bronx. A promising young musician, he fell in with the wrong crowd out of the hope that it would lend support and credibility to his burgeoning rap career. As discussed more fully below, he has a supportive family, and his participation in the criminal organization central to this case was peripheral at best. We submit that a below guidelines sentence of 60 months, the mandatory minimum for the charge of conviction, would be sufficient, but not greater than necessary, to meet the goals of sentencing in this case.

## **WHAT IS A JUST SENTENCE IN THIS CASE?**

    It is imperative in our nation's form of criminal sentencing that a defendant not be overly punished for his crime. This is the essence of the Supreme Court's guidance with respect to the sentencing factors enumerated in 18 U.S.C. § 3553(a). See *Rita v. United States*, 551 U.S. 338 (2007). With this goal in mind, the factors required to be considered under § 3553(a) include:

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed –
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to



         provide just punishment for the offense;
         (B) to afford adequate deterrence to criminal conduct;
         (C) to protect the public from further crimes of the defendant; and
         (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentence range established for –
         (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
…
(5) any pertinent policy statement –
…
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1)-(7); *see also United States v. Booker*, 543 U.S. 220 (2005). In light of the multi-faceted inquiry under § 3553(a), the Supreme Court has held the Guidelines are no longer mandatory, but rather are *advisory* and constitute one factor to be considered by the sentencing court in fashioning a sufficient sentence. *See Booker*, 543 U.S. 220.

In *Gall v. United States*, 552 U.S. 38 (2007), the United States Supreme Court reiterated the importance of the sentencing court's discretion in fashioning an appropriate sentence for the particular criminal defendant before it. In particular, the court made clear that a departure from the Guidelines, even one resulting in an unusually lenient sentence, may be justified if the sentencing court can clearly explain why it is appropriate in a particular case with sufficient justifications. *Id. Gall* definitively instructs the sentencing court that a Guidelines calculation is a necessary starting point for determining a sentence, but it cannot be the end of the court's analysis. The Second Circuit has confirmed that "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F .3d 180, 188 (2d Cir. 2008).



I.       **Who is Ali Doby?**

Ali Doby was born on December 14, 2002.  19-years-old at the time of his arrest, Ali celebrated his 20th and 21st birthdays, incarcerated, during the pendency of this case.  Growing up in the Bronx, Ali's childhood contained many of the hallmarks which unfortunately lead many similarly-situated young men to involvement in the criminal legal system.  Born to a father struggling with heroin addiction, Ali was raised primarily by his mother.  When he was an infant, Ali's mother sent him to live for a time with his paternal grandmother in Coop City —a Godsend in many respects because of the stability, love, and resources that she, as a retired English professor Columbia University, has been able to provide him over the course of his life — simply because his mother did not have the financial ability to care for both of them.  PSR, at ¶ 68.  When Ali returned to live with his mother, the family lived in a situation of extreme poverty.  *Id.*, at ¶¶ 68–69.  Ali, his mother, and his four siblings all lived together in one room, and Ali at times had to beg strangers for money in order to buy food.  *Id.*  It was, as Ali describes, "survival mode." *Id.*, at ¶ 69.

Ali is a bright young man who did well in school up until the COVID-19 pandemic forced New York City high schools to transition to remote learning.  The COVID lockdown was difficult on all of us but perhaps especially so on the young people trying to navigate and complete high school during a time of such upheaval.  Ali never finished high school once classes went online. *Id.*, at ¶ 80.  Due to the disruption of COVID, Ali's brother and co-defendant, Maurice Sinclair, invited Ali to join him in the narcotics conspiracy, which Ali immaturely viewed as a good idea through the lens of being able to earn quick, albeit small amounts, of money that he could use to book studio time, produce music videos, and otherwise further his music career.  Without



discounting the decision Ali made, which he takes full responsibility for, the sad reality is that if COVID had never existed, there is a strong likelihood that Ali would have never used the time out of school to sell drugs.

Ali's mother blames herself for his lapse in judgement. *Id.*, at ¶ 66. Because she was working so hard, including multiple shifts at times to support their family, she was not as present in Ali's life as she wished she could have been and the other influences in the neighborhood were not positive ones. *See id.*

### A. Music as a Ticket Out

Ali's true passion was, and remains, music. Prior to his father's substance abuse issues, his father worked within the music industry, providing security for executives within Bad Boy Records, and the like, back in the late 90s and early 2000s. With that perspective and the stories told from his father of the highlife and heyday of early the millennium "bling-bling" hip-hop, Ali viewed music as a means to escape his life of poverty and achieve success. Rapping under the name Lee Drilly, by the time of his arrest, Ali had begun to establish a name for himself in the burgeoning Drill rap scene in the Bronx. He currently has almost 90,000 monthly listeners on Spotify, and his music videos have been viewed hundreds of thousands of times on YouTube.

The subject matter of Ali's music unquestionably reflects the conduct which underlies the indictment in this case. The debate over whether rap music glorifies criminal activity such as drug trafficking dates back to at least the debut of N.W.A. in the early 90s and need not be decided here. The practical reality is that music reflecting this lifestyle is extremely popular and has been for over 30 years. What this means for Ali is his success in the music industry, his ability to capitalize on his talent and make it out of the circumstances in which he grew up, was dependent on his



association with others in his neighborhood who were participating in this lifestyle, such as his co-defendants in this case. They lent credibility to his artistic representations of a certain lifestyle common in the Bronx and elsewhere in this country.

Ali's involvement in the current case has caused him to reflect on what he wants his music to say. Even if he is still addressing the issues faced by his community, Ali is clear that he does not want to glorify the lifestyle and plans to use his ability to connect with people through music to be clear with his audience what the repercussions are of this lifestyle; repercussions that he is currently living through himself, and which are not often discussed in commercialized hip-hop, as the focus in commercialized hip-hop tends to focus on the riches, material items, and overall "fun" that an illicit lifestyle can gain.

## II. The Nature of Ali's Criminal Conduct Does Not Warrant a Long Sentence

Ali's participation in the criminal organization charged in this case was relatively minor. He was the principal seller of crack in just one transaction recorded by the Government and was otherwise essentially just present while others were doing the selling. PSR, at ¶¶ 25–29. **Furthermore, he never possessed a firearm or participated in any crimes of violence with respect to the whole of the charged conduct.** Indeed, Ali was notably only charged under Count 1 of the superseding indictment and thus none of the firearm-related charges. *See* ECF No. 28. None of this is intended to diminish Ali's conduct; one sale of crack is a serious crime, that has deleterious effects upon the community in which it is sold, the users who use it, and particularly in this instance, for the community members, children, grandmothers, and the like, who live in the building and have to walk through the lobby of where the criminal organization in this case sold it. Ali knows now, and knew then, that he should not have participated in any fashion with the



criminal activity.  It is important to understand the context of Ali's involvement with this group, however. Ali is the youngest person indicted in connection with this conspiracy and was brought in by his older brother, Maurice.  Ali was just 19 years old at the time of his arrest, while the other conspirators ranged from their late twenties to early forties.  Ali was permitted to hang out in the periphery of the organization, which provided him the credibility, the lens with which to inspire lyrics, and the menial financial means to further his rap career.  In return, the other individuals got to participate in the rap scene, appear in music videos, and "support" (with that term used very loosely) a neighborhood kid who one day could become famous.

To that end, as the Court is assuredly aware, Ali was indicted on New York state charges including murder for allegations that preceded the start of this case. PSR, at ¶ 59.  The context of these charges, while extremely serious, further highlights the peripheral nature of Ali's association with any criminal organization, as discussed above.  The state charges stem from an incident on July 20, 2020, where Ali was standing in front of an apartment building in the Bronx with a large number of other individuals— precisely the type of people Ali would spend time with to lend street credibility to his music.  The decedent, a member of a rival gang to that of some of the individuals Ali was with, approached the group and began to shoot at them without provocation.  Several other individuals, that is, *not Ali*, returned fire and chased after the decedent, who ultimately died as a result of a gunshot wound.  Again, Ali found himself in trouble because of the people he had surrounded himself with.  Ali had no argument with the individual who approached the group and started shooting, but since Ali had ingratiated himself with the group in order to help his career, he was present when some of those individuals reacted in self-defense, as well as in retaliation for the decedent's conduct.



To be clear, in that instance, Ali did not have a gun at any point, and never struck or otherwise caused harm to the decedent. Ali participated in the group's chase after the decedent, primarily in an immature and ill-timed attempt to show solidarity to the same group that provided street credibility for his music, but never touched or harmed the decedent, despite ample opportunity to do so if he had chosen, particularly with the knife that he removed from the decedent's possession when he caught up with the decedent, as visible on the surveillance video of the incident.

Based upon the undersigned's discussions with state prosecutors, we submit that we are very close to reaching a plea deal in that matter, most likely before the March 29th sentencing hearing in the instant federal matter. Given Ali's minimal involvement in the events of that evening, Ali will not be convicted of murder or attempted murder and based on our discussions with the Bronx District Attorney's office, it is likely that he will plead to Attempted Assault in the Second Degree, which is an E-level felony, New York's lowest level felony classification. We have a final plea negotiation scheduled with the Bronx District Attorney's Office on Tuesday, March 19, and intend to inform the Court of the final resolution of the Bronx state case ahead of Ali's March 29, 2024 sentencing hearing.

Ali takes responsibility for his involvement with the group that night, regrets his actions, and certainly hates that he watched a man lose his life that evening. But his conduct on that night, and his similarly minor role in what transpired, goes to further show that he is not a violent person, and that he is not an active member in the criminal conspiracies going on around him in the vicinity of the Gun Hill Houses in the Bronx. Like many young men, he is mostly guilty of being a follower, while guising himself in the false bravado of being a competently secure leader.



### III. The Need to Avoid Sentencing Disparities – Ali is Less Culpable than the Other Defendants

§ 3553(a)(6) highlights the need for courts to avoid sentencing disparities between defendants with similar records who have been found guilty of similar conduct. While this factor applies in all federal sentencings, it is given particularly sharp relief when a defendant is sentenced in a multi-defendant case such as this one.

In this case, three codefendants, Maurice Sinclair, Zukeila Plaza and John Graves, pled guilty to the same charge as Ali: Conspiracy to Distribute and Possess with Intent to Distribute Crack Cocaine in violation of 21 U.S.C. § 846. PSR, at ¶¶ 8 and 9. All three codefendants were demonstrably more culpable than Ali in the criminal organization. Ms. Plaza received a sentence of 60 months, Mr. Graves received a sentence of 65 months, and Mr. Sinclair received a sentence of 68 months; each sentence significantly below both their guidelines ranges and the sentences sought by the Government. *Id.*; ECF Minute Entry dated 03/07/2024. Additionally, both Ms. Plaza and Mr. Graves have more substantial criminal histories than Ali.

Mr. Graves participated in four recorded drug sales and sold 65 zips of crack and 20 glassines of heroin and fentanyl. ECF No. 187, at 2. In comparison, Ali participated in one sale, totaling 41 zips of crack. Mr. Graves also has past convictions and served periods of incarceration for past criminal conduct, including the sale of narcotics, while Ali has no criminal record outside of the pending case in Bronx County discussed above. *Id.*, at 5.

Ms. Plaza served as the organization's principal supplier of crack cocaine for a period of two years beginning in October 2020. ECF No. 164, at 1–2. Additionally, in her plea she took responsibility for the possession of between 5 and 8.4 kilograms of crack, as well as a firearm. *Id.*



Finally, Mr. Sinclair likewise pleaded to conduct involving between 5 and 8.4 kilograms of crack, and an enhancement due to possession of a firearm, which he regularly carried himself. ECF No. 219, at 2. The Government's sentencing submission for Mr. Sinclair specifically notes that he was one of the most culpable defendants, and that as Ali's older brother he caused Ali's involvement with the organization. *Id.*, at 4–6. As discussed above, Ali's plea only involved between 2 and 2.8 kilograms of crack and did not include possession of a firearm.[1]

Thus, the best way to punish each codefendant in accordance with their relative culpabilities and to avoid unwarranted disparities between similarly situated defendants would be to sentence Ali to the mandatory minimum 60 months.

### IV. A Guidelines Sentence is Not Necessary for Deterrence or to Protect the Community

The sentencing goals of general and specific deterrence, incapacitation, and community protection would be more than satisfied by a mandatory-minimum sentence in this case. Five years is a significant prison term, especially for a 21-year-old defendant being sentenced for crimes committed when he was 19 years old. Such a sentence sends a clear message that engaging, even in a limited fashion, with this type of criminal organization will result in serious punishment. Ali will also be specifically deterred from future criminal conduct by a 60-month sentence. He will spend a significant portion of his young adulthood behind bars. Ali is determined never to end up in this situation again. Even before being sentenced Ali has been shuffled between four different correctional facilities (Rikers Island, MDC, Essex County, MDC again, and Hudson County). This

---

[1] Comparing Ms. Plaza's sentencing submission and that of the Government it seems clear that the Court's decision to sentence her to 60 months was based in large part on the nature of her relationship with the organizer of the criminal organization, which of course does not apply in Ali's case, but we fell it worth noting the discrepancy between their individual conduct.



repeated adjustment to new situations has been mentally and emotionally taxing, and his family not knowing where he is or how to contact him has compounded his stress.

In addition to losing his liberty, Ali has lost the momentum that his promising music career had before he was arrested. Ali plans to continue pursuing a career in music once he is released, but with the growth and added perspective that comes from undergoing what he has experienced. Ali wants to use his music to explain to the culture the consequences of glorifying the gang lifestyle. Ali has seen death on the streets of the Bronx, and he is going to lose at least five years of his life to a jail cell. He will not be returning to the life he had before, and he wants to share his growth with the 90,000 people who listen to his songs every month.

Furthermore, he has a supportive, loving family who will work to make sure that he does not end up back where he was before this case. Once Ali is released, his mother plans to move the family out of New York City, to allow Ali a fresh start away from the influences in the Bronx which led to his current situation.

In *United States v. Ginzburg*, Judge Weinstein sentenced a 22-year-old man who had served as a distributor of MDMA for a number of years to three years of incarceration, departing significantly downward from the guidelines range of 97 to 121 months. 2010 WL 2540599, at *2 (E.D.N.Y. June 17, 2010). Judge Weinstein noted that general and specific deterrence were satisfied by the three-year sentence and further stated that the community was sufficiently protected because "[i]t is unlikely that he will engage in further criminal activity in light of his youth and his supportive family." *Id.* A 60-month sentence for Ali will similarly serve the goals of sentencing, and Ali's youth and supportive family indicate he is unlikely to reoffend in the future.



### V.     A Guidelines Sentence Would Over-Punish Ali

In *Ginzburg*, Judge Weinstein also discussed the outsized effect a long sentence would have on a young defendant, concluding "[d]ue to the defendant's youth and immaturity, sentencing within the guidelines would not be appropriate because it would be overly destructive. *Ginzburg*, 2010 WL 2540599, at *2.  A below-guidelines sentence will afford Ali an opportunity to restart his life on a positive track upon release, still as a relatively young man and not yet hardened by a lengthy prison term.  *See United States v.* Lawrence, 254 F.Supp.3d 441, 446 (E.D.N.Y. 2017) ("Young defendants are eventually released from prison. If they are hardened as criminals during their incarceration, they will pose a greater danger to their community when they get out.").

### CONCLUSION

Ali Doby is a young man who, like many in his circumstance, made the mistake of falling in with the wrong people and the wrong lifestyle.  Ali takes responsibility for his actions, accepts that he will be punished, and vows to live a law-abiding life once released from prison.  For these reasons, and those discussed above, a below-guidelines sentence of 60 months is sufficient, but not greater than necessary to meet the goals of sentencing.

Respectfully submitted,

/s/ Phillip Hamilton
Phillip Hamilton, Esq.
Ethan Van Buren, Esq.